IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LOTTORIA BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-1705 (MN) |
| | ) | |
| ANDREW M. SAUL, Commissioner of | ) | |
| Social Security Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

Lottoria Brown, Wilmington, Delaware; Pro Se Plaintiff.

Eric P. Kressman, Regional Counsel, and Anne von Scheven, Assistant Regional Counsel, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania; David C. Weiss, United States Attorney for the District of Delaware, Wilmington, Delaware; and Heather Benderson, Special Assistant United States Attorney, Office of the General Counsel, Philadelphia, Pennsylvania, Attorneys for Defendant.

February 20, 2020
Wilmington, Delaware

---

[1]     Andrew Saul was sworn in as the Commissioner of Social Security on June 17, 2019. Pursuant to Federal Rule of Civil Procedure 25(d), Andrew Saul is substituted for Nancy A. Berryhill, Acting Commissioner of Social Security who was named as the defendant in this suit.

**NOREIKA, U.S. DISTRICT JUDGE:**

Plaintiff Lottoria Brown ("Brown" or "Plaintiff"), who appears *pro se*, appeals the decision of Defendant Andrew M. Saul, Commissioner of Social Security ("the Commissioner" or "Defendant"), denying her application for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act. *See* 42 U.S.C. §§ 1381-1383f. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Pending before the Court are Plaintiff's motion for summary judgment and Defendant's cross-motion for summary judgment. (D.I. 12, 14). Plaintiff asks, "that both of the previous cases for disability benefits claims be reversed and disability benefits be granted with back pay extending back to 2010." (D.I. 12 at 2). The Commissioner asks the Court to deny Plaintiff's motion for summary judgment and to affirm the decision denying Plaintiff's claim for benefits. (D.I. 15 at 18-21). For the reasons stated below, the Court will deny Plaintiff's motion and will grant Defendant's cross-motion for summary judgment.

I. <u>BACKGROUND</u>

A. **Procedural History**

In 2010, Plaintiff filed applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and SSI and, in a March 11, 2013 decision, the Administrative Law Judge ("ALJ") denied her applications. (D.I. 8-3 at 5-15). The Appeals Council denied Plaintiff's request for review on June 17, 2014, and Plaintiff did not appeal the Commissioner's final decision. (*Id*. at 22-24).

On July 7, 2014, Plaintiff filed for SSI benefits, alleging disability beginning November 23, 2008 due to major depression, obesity, and asthma. (D.I. 8-5 at 2-11; D.I. 8-6 at 8). Plaintiff's application was denied initially on November 21, 2014, and upon reconsideration

on July 9, 2015.   (D.I. 8-3 at 45-61).   Plaintiff requested an administrative hearing before an ALJ, and it was held on June 23, 2017.   (D.I. 8-2 at 31-68; D.I. 9-4 at 3).   Plaintiff, who was represented by counsel, provided testimony as did vocational expert ("VE") Ray Burger.   The ALJ issued a decision on August 30, 2017, finding that Plaintiff was not disabled.   (D.I. 8-2 at 13-30).   Plaintiff sought review by the Appeals Council, submitted additional evidence, and her request was denied on August 31, 2018, making the ALJ's decision the final decision of the Commissioner.   (D.I. 8-4 at 74-75).   On October 30, 2018, Plaintiff, appearing *pro se*, filed this action seeking review of the final decision.   (D.I. 2).

### B.   Factual History

#### 1.   Disability Report – August 14, 2014 (Form SSA-3368)

In her disability report dated August 14, 2014 (Form SSA-3368) (D.I. 8-6 at 7-14), Plaintiff asserts the following physical or mental conditions limit her ability to work: major depression, obesity, and asthma.   (*Id*. at 8).   She indicates that she stopped working on June 1, 2010 because of her condition.   (*Id*.).   Plaintiff lists the following medications on her disability report that she takes:   for depression - Ambien, Celexa, Depakote, Haldol decanoate, Wellbutrin, and Zyprexa; and for asthma - Albuterol and Proair.   (*Id*. at 11).   Plaintiff lists the following providers as having medical records about her physical and mental conditions:   David Hack, M.D. ("Dr. Hack") and Ralph Kaufman, M.D. ("Dr. Kaufman").

#### 2.   Disability Reports – Appeal (Form SSA-3441)

In her January 9, 2015 appeal disability report (D.I. 8-6 at 40-47), Plaintiff indicates that her mental condition continues to worsen, her physical and mental limitations continue to worsen, and she has no new physical or mental limitations as a result of her illnesses, injuries, or conditions. (*Id*. at 40).   The medical provider listed is Dr. Michael Fruchter ("Dr. Fruchter").   (*Id*. at 42).

Medications listed include Ambien, Depakote, Haldol, Melatonin, Strattera, Wellbutrin, and Zyprexa. (*Id*. at 42).

In her September 3, 2015 appeal disability report (*id*. at 62-69), Plaintiff indicates that her condition continues to worsen, and she has no new physical or mental conditions. (*Id*. at 63). The medical providers listed are Dr. Nana Berikashvili ("Dr. Berikashvili"), Dr. Hack, and Dr. Gerald Mehalick ("Dr. Mehalick"). (*Id*. at 64-66). Medications listed are Ambien, Depakote, Haldol, Melatonin, Strattera, Wellbutrin, and Zyprexa. (*Id.* at 67).

### 3.    Medical History, Treatment, and Conditions

### a.    Physical Conditions, Providers, and Treatment

In September 2015, Plaintiff presented to St. Francis Family Practice with complaints of right ankle pain. (D.I. 8-13 at 6). Plaintiff reported that she had not injured her ankle but she was working ten-hour shifts in a warehouse and walking "a lot." (*Id*.). Assessment was "likely ankle sprain," Plaintiff was provided an ace wrap, and started on Ibuprofen for pain. (*Id*.). When Plaintiff was seen a week later, her ankle pain had resolved. (*Id*. at 8).

December 2015 St. Francis Family Practice medical notes indicate that Plaintiff has a history of intermittent complaints of low back pain, which became more frequent during her employment at Amazon that required frequent lifting. (D.I. 8-13 at 13, 15). Examination of the lumbosacral spine indicated normal movement and no muscle spasm. (*Id*. at 14). Physical therapy was recommended. (*Id*. at 15).

On January 22, 2016, Plaintiff presented with complaints of low back pain that had worsened over the last four to six weeks. (*Id*. at 16). Plaintiff believed the increased pain was "from her job." (*Id*.). She had been off work since January 11, 2016, and had started physical therapy. (*Id*.). Examination revealed mild tenderness in the lumbar spine, but full motor

strength, negative straight leg raising, and a normal gait. (*Id*. at 17). Her doctor recommended Tylenol and Voltaren (an NSAID) and opined that weight loss would help. (*Id*.).

By February 2016, Plaintiff continued with low back pain, but noted that it had improved since she had been off work. (*Id*. at 19). Plaintiff relayed that she liked her job at Amazon and seemed to get along with the staff. (*Id*.). Plaintiff asked about "easing into" a return to work, and her physician suggested Plaintiff enter on light duty work. (*Id*.). Plaintiff improved with physical therapy and seemed to be better being off work. (*Id*. at 20).

Plaintiff complained of worsening low back pain again in early July 2016, and asked her physician to complete a short-term disability benefits form for the dates June 1 through July 21, 2016. (*Id*. at 33). Office notes from July 21, 2016 refer to Plaintiff's April CT scan of the lumbar spine that indicated very mild degenerative changes resulting in very mild bilateral neural foraminal narrowing at L5-S1 and to a January 2016 x-ray that showed mild degenerative changes of the lumbar spine. (*Id.* at 33, 35). A musculoskeletal examination revealed normal range of motion of the lumbar spine, no limping, muscle weakness, or swelling. (*Id*. at 34-35). Dr. Nasim M. Taheri ("Dr. Taheri"), the physician who saw Plaintiff, filled out the short term disability form and opined that he did not believe Plaintiff qualified for long-term disability, but she may benefit from changing her job as there was no light duty work available for her. (*Id*. at 35).

During an August 17, 2016 visit with Dr. Hack, Plaintiff reported that she continued to struggle with low back pain. (*Id*. at 40). At the time, she worked at Wawa as a cashier. (*Id*.) Examination revealed mild tenderness in the lumbar spine, full motor strength, and a normal gait. (*Id*. at 41). In February 2017, Plaintiff continued with complaints of pain and difficulty walking. (*Id.* at 46). She was no longer working. (*Id*.). Once again, examination revealed mild tenderness in the lumbar spine, full motor strength, and a normal gait. (*Id*. at 7). When Plaintiff

was seen by Dr. Hack on April 20, 2017, regarding her back, she noted that she did not have any radicular pain and reported that she was "improving." (D.I. 8-13 at 55, 57).

### b. Mental Conditions, Providers, and Treatment

Plaintiff has a history of inpatient mental health treatment in March 2010 for major depression; and in July 2011 for mood disorder, not otherwise specified, and bipolar disorder. (D.I. 8-10 at 32-48). Discharge notes for the July 2011 inpatient care indicate that following treatment, Plaintiff's mental status examination showed a constricted affect; depressed mood; Plaintiff was somewhat anxious; her thought process was generally logical and goal directed; no evidence of paranoia or delusions; Plaintiff denied hallucinations; she was alert and oriented to person, time, and place; concentration and attention span were reasonably intact; recent and remote memory was fairly good; impaired insight and judgment; and retarded psychomotor activity. (*Id*. at 47-48).

Plaintiff received outpatient mental health treatment with her family practice provider at St. Francis Healthcare. (D.I. 8-9 at 2-79; D.I. 8-10 at 2-27; D.I. 8-13 at 2-63). Treatment records from 2009 through 2013 show that Plaintiff was alert and oriented, with appropriate mood and affect, and no suicidal or homicidal ideation. (*See* D.I. 8-9 at 3, 6, 29, 31, 37). At times, Plaintiff presented with anxiety, depression, and was easily irritated, although she reported those symptoms improved with medication. (*Id.* at 13, 28, 30, 36, 37). When Plaintiff was seen on July 30, 2013, she did not demonstrate anxiety, depression, mood changes, or apparent attention deficit. (*Id.* at 45). At her December 2015 appointment, Plaintiff reported that she felt "very well" on medication and believed it was "really working." (*Id*. at 36).

Treatment records from 2016 indicate that Plaintiff's mental symptoms were stable, that she had good focus and concentration, and that she showed no evidence of psychosis or adverse

effects of medication. (D.I. 8-11 at 44, 46). In January 2017, Plaintiff reported she had been looking for employment, found employment and begun training for her new job but had concerns about daily transportation to work. (*Id.* at 122-124). She showed signs of a stable mood. (*Id.* at 124).

When Plaintiff was seen by Dr. Hack on April 20, 2017, he observed that Plaintiff seemed "a bit paranoid today" and noted that she was "working with outpatient psych" on medication titration, and that Plaintiff was not sure of the dosing of her medications. (*Id.* D.I. 8-13 at 57). Plaintiff was seen in early May 2017 and reported that she had been having intermittent episodes of disorientation and feeling fuzzy. (*Id.* at 58). Plaintiff reported that the episodes had disappeared when she took Depakote, but they returned after she self-discontinued the medication about a year ago. (*Id.*). Dr. Hack discussed the benefits of medication with mood stabilization and the plan was to restart several medications that had been discontinued. (*Id.* at 60).

Plaintiff also received outpatient mental health treatment at Connections Community Support Programs from May 2015 to May 2017. (D.I. 8-11 at 3-127); D.I. 8-12 at 34-125). With the exception of feeling more depressed, Plaintiff's mental status examinations revealed that she was neat, clean, and fully oriented, and she exhibited good rapport, normal speech and thought processes, a good mood, congruent affect, intact memory, an estimated average intelligence, and fair insight and judgment. (D.I. 8-11 at 7, 8, 41, 43-48, 50-52, 54, 58, 60). In July 2015, Plaintiff reported that she was "more active," "up and out looking for work," and not depressed like she had been. (*Id.* at 41). By April 2016, Plaintiff was settling into a new apartment, in good spirits, and reported an upcoming job interview. (*Id.* at 48). In June 2016, Plaintiff was "upbeat" and getting ready to work at Wawa. (*Id.* at 50). By October 2016, she had lost her job and had found

another one as a legal assistant. (*Id*. at 54). Plaintiff was calm and cooperative and her psychiatric symptoms were stable. (*Id*.).

When Plaintiff was seen for her annual psychiatric reevaluation on May 3, 2017, it was noted that Plaintiff had moved into her own apartment. (D.I. 8-12 at 124). Mental status exam notes state, "reasonable control with current regimen – for a time she refused her Haldol, and subsequently experienced an upswing of paranoid thinking – finances and her children have been major stressors. (D.I. 8-12 at 124). Her diagnosis was changed from bipolar to schizoaffective based upon the mental status exam. (*Id*. at 124-125).

### c. Medical Consultants

On September 14, 2014, Irwin Lifrak, M.D. ("Dr. Lifrak"), performed a consultative examination of Plaintiff. (D.I. 8-7 at 2-8). Examination revealed Plaintiff had a mild limp, favored the right leg and exhibited a slightly reduced range of motion of the lumbar spine, but otherwise no limitations in gait or movement; full (5/5) muscle strength in the upper and lower extremities; no muscle spasm; and normal neurological findings. (*Id.* at 4-5, 8). Dr. Lifrak's diagnostic impression included degenerative joint disease and possible disc damage. (*Id*. at 5). He opined that Plaintiff would be able to sit and stand for a total of six hours each in an eight-hour workday, and lift up to ten pounds. (*Id*. at 6).

State agency physicians Vinod Kataria, M.D. ("Dr. Kataria"), and Darrin Campo, M.D. ("Dr. Campo"), reviewed Plaintiff's claim for benefits in September 2014 and July 2015, and opined that she had the physical residual functional capacity to perform a range of light work with postural and environmental limitations. (D.I. 8-3 at 38-40, 52).

On October 6, 2014, Frederick Kurz, Ph.D. ("Dr. Kurz"), performed a consultative psychological evaluation. (D.I. 8-7 at 104-108). He observed that Plaintiff walked freely with a

normal gait, and presented as mildly disheveled. (*Id.* at 104). Plaintiff reported symptoms of depression, but she was able to follow directions and answer questions, her speech was relevant and goal-directed, and she showed no evidence of thought-processing disorders. (*Id.* at 104-105). Plaintiff's affect was flat and she appeared to be lethargic, but she was courteous and cooperative, with no overt indications of depression or anxiety. (*Id*. at 106). Mental status examination revealed that Plaintiff was fully oriented, with some difficultly with attention, but an ability to reason logically and sequentially. (*Id*.). Dr. Kurz formed an impression of schizophrenia, major depressive disorder, and attention deficit hyperactivity disorder. (*Id*. at 106, 107). His psychological functional capacities evaluation form found Plaintiff had moderately severe impairments in all spheres except in her ability to understand simple, primarily oral instruction where she had a moderate impairment. (D.I. 8-8 at 2). Dr. Kurz noted that the "effects of mental illness will compromise [Plaintiff's] ability to function in a competitive, labor market setting." (*Id*.).

State agency psychologists Christopher King, Psy.D. ("Dr. King"), and Patricia Miripol, Ph.D. ("Dr. Miripol"), reviewed Plaintiff's claim for benefits in November 2014 and July 2015, and opined that she had the mental residual functional capacity to perform simple, repetitive tasks; and would be better suited to jobs with little contact with the public. (D.I. 8-3 at 40-42, 56-57).

### 4. The Administrative Hearing

#### a. Plaintiff's Testimony

Plaintiff was born on June 4, 1978, has a GED, and completed some trade school courses as a medical assistant and legal assistant. (D.I. 8-2 at 36-37). Plaintiff has a driver's license and can drive, but does not have a car. (*Id*. at 42). She lives in subsidized housing for individuals with mental health disorders. (*Id*. at 41).

Plaintiff testified that her physical problems include a joint problem in her feet because her ankles get displaced, degenerative spine disease, and severe asthma. (*Id*. at 43-48). Plaintiff described her psychological problems as bipolar and anxiety disorder when she gets depressed. (*Id*. at 38). She testified that she takes medication for her psychological problems, and that her conditions have improved but not enough for her to work. (*Id*. at 40).

Plaintiff testified that she has past work as a picker for Amazon before she collected short-term disability payments from January 2016 to May 2016 due to back pain; worked part-time at Wawa but had psychological and physical problems when she worked there; and worked as a claims verifier, but had problems focusing and poor work attendance. (*Id*. at 48, 49, 52-57, 59-63). In February of 2017, Plaintiff was hired at Host International but was unable to complete orientation because the standing requirements of the job caused sciatica down her left side. (*Id*. at 60-61).

When asked about her ability to perform low stress jobs, Plaintiff testified that she would be unable to perform a job that required sitting eight hours per day due to back pain. (*Id.* at 58). She testified that if she could perform a low stress job, hers as a claims verifier "would have been the perfect job," but she was unable to remain focused for too long. (*Id*. at 58).

**b.      Vocational Expert's Testimony**

A VE testified at the administrative hearing. (D.I. 8-2 at 66-68). The ALJ asked the VE to consider a hypothetical individual of Plaintiff's vocational background and age who could perform light work with only occasional climbing of ramps, stairs, ladders, ropes, and scaffolds; occasional stooping, kneeling, crouching, and crawling; only simple, routine, repetitive tasks; and only brief and superficial interaction with the public or coworkers. (*Id*. at 66-67). The VE testified that such an individual could not perform her past relevant work, but identified other jobs

in the national economy that could be performed including housekeeping cleaner, laundry worker, and stock checker, which existed in significant numbers in the national economy. (*Id*. at 67). Next, the ALJ asked the VE to identify any job, assuming an individual with the same vocational factors as Plaintiff, but due to a combination of impairments the individual is unable to engage in sustained work activity for a full eight-hour day on a regular and consistent basis, and the VE replied "for that hypothetical there is no work." (*Id*. at 67).

### C.    The ALJ's Findings

On August 30, 2017, the ALJ issued the following findings (D.I. 8-2 at 13-25):

1.    The claimant has not engaged in substantial gainful activity since July 7, 2014, the application date (20 CFR 416.971 *et seq*.).[2]

2.    The claimant has the following severe impairments:  anxiety disorder, major depressive disorder, bipolar disorder, degenerative changes of lumbar spine, obesity (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the ALJ found that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that she could only occasionally climb ramps or stairs, occasionally climb ladders, rope, or scaffolds, and occasionally stoop, kneel, crouch, or crawl.  The claimant would be limited to only simple, routine, and repetitive tasks, with only brief and superficial interaction with the public and coworkers.[3]

---

[2]    The ALJ noted that there was some evidence that Plaintiff had worked since the alleged onset date but gave Plaintiff some benefit of the doubt and acknowledged that a sheltered work environment or other explanation as to why the earnings did not accurately reflect Plaintiff's productive capacity remained a possibility and, from a practical standpoint, recognized that the earnings would not be considered evidence of substantial gainful activity for purposes of the ALJ's decision.  (D.I. 8-2 at 15).

[3]    Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on June 4, 1978 and was 36 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since July 7, 2014, the date the application was filed (20 CFR 416.920(g)).

## II.     LEGAL STANDARDS

### A.      Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.   *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10

---

To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, it is determined that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.   20 C.F.R. § 416.967(b).

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.   20 C.F.R. §§ 404.1567(a), 416.967(a).

(1986).   A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must support its assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."   Fed. R. Civ. P. 56(c)(1)(A) & (B).   If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial."   *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted).   The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."   *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."   *Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. U.S. Postal Serv*., 409 F.3d 584, 594 (3d Cir. 2005) (stating that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).   However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).   "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."   *Id*. at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

**B.    Review of the ALJ's Findings**

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190-91. The Court's review is limited to the evidence that was presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). Evidence that was not submitted to the ALJ can be considered, however, by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has made clear that a "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by

countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (*e.g.*, that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## III.    DISCUSSION

### A.       Disability Determination Process

A "disability" is defined for purposes of SSI as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. § 1382c(a)(3)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 416.920(a); *Hess v. Commissioner of Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019). If a finding of disability or nondisability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. § 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 416.920(a)(4)(i) (mandating finding of nondisability when claimant is engaged in substantial gainful activity); *Hess*, 931 F.3d at 201. If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *Id.* If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (20 C.F.R § 404.1520, Subpart P, Appendix 1) that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 416.920(a)(4)(iii); *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014). When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *Id.* If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 416.920(e); *Hess*, 931 F.3d at 201.

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform his or her past relevant work. *See* 20 C.F.R. § 416.920(a)(4)(iv) (stating that claimant is not disabled if claimant is able to return to past relevant work); *Zirnsak*, 777 F.3d at 611. A claimant's RFC "is the most [a claimant] can still do despite [their] limitations." 20 C.F.R. § 416.945(a)(1). "[T]he claimant always bears the burden of establishing (1) that she is severely impaired, and (2) either that the severe impairment meets or equals a listed impairment, or that it prevents her from performing her past work." *Zirnsak*, 777 F.3d at 611 (quoting *Wallace v. Secretary of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983). If the claimant cannot perform her past relevant work, the ALJ moves on to step five. *Hess*, 931 F.3d at 202.

At step five, the ALJ examines whether the claimant "can make an adjustment to other work[,]" considering her "[RFC,] . . . age, education, and work experience[.]" 20 C.F.R. § 416.920(a)(4)(v) and (g); *Hess*, 931 F.3d at 202. That examination typically involves "one or more hypothetical questions posed by the ALJ to [a] vocational expert." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). If the claimant can make an adjustment to other work, she is not disabled. 20 C.F.R. § 416.920(a)(4)(v). If she cannot, she is disabled.

At this last step, ". . . the Commissioner bears the burden of establishing the existence of other available work that the claimant is capable of performing." *Zirnsak*, 777 F.3d at 612 (citing *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987)). In other words, the Commissioner ". . . is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do, given [their] residual functional capacity and vocational factors." 20 C.F.R. § 416.960(c)(2). "'Ultimately, entitlement to benefits is dependent upon finding the claimant is incapable of performing work in the national economy.'" *Zirnsak*, 777 F.3d 612 (quoting *Provenzano v. Commissioner of Soc. Sec.*, Civil No. 10-4460 (JBS), 2011 WL 3859917, at *1 (D.N.J. Aug. 31, 2011)).

When mental impairments are at issue, additional inquiries are layered on top of the basic five-step disability analysis and an ALJ assesses mental impairments. 20 C.F.R. § 416.920a(a); *Hess*, 931 F.3d at 202. As part of step two of the disability analysis, the ALJ decides whether the claimant has any "medically determinable mental impairment(s)." 20 C.F.R. § 416.920a(b)(1); *see also* 20 C.F.R. § 416.920(a)(4)(ii) (providing that, at step two, the ALJ determines whether the claimant has "a severe medically determinable physical or mental impairment"); *Hess*, 931 F.3d at 202. "[A]s part of that same step and also step three of the disability analysis, the ALJ determines 'the degree of functional limitation resulting from the impairment(s)[.]'" *Hess*, 931

F.3d at 202 (quoting 20 C.F.R. §416.920a(b)(2) and citing 20 C.F.R. §§ 416.920a(d), 416.920(a)(4)(ii)-(iii) (explaining that the ALJ uses "the degree of functional limitation" in assessing "the severity of [the claimant's] mental impairment(s)[,]" which is considered at steps two and three)).

In determining the degree of functional limitation, the ALJ considers "four broad functional areas . . .: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 416.920a(c)(3); *Hess*, 931 F.3d at 202. The first three areas are rated on a "five-point scale: None, mild, moderate, marked, and extreme." 20 C.F.R. § 416.920a(c)(4); *Hess*, 931 F.3d at 202. The fourth is rated on a scale of: "None, one or two, three, four or more." *Id.*

"The ALJ uses that degree rating in 'determin[ing] the severity of [the] mental impairment(s)[,]' which is considered at steps two and three. *Hess*, 931 F.3d at 202 (quoting 20 C.F.R. § 416.920a(d) and citing 20 C.F.R. § 416.920(a)(4)(ii)-(iii) (stating that, at steps two and three, the ALJ "consider[s] the medical severity of [the claimant's] impairment(s)"). "If . . . the degree of [the claimant's] limitation in the first three functional areas [is] 'none' or 'mild' and 'none' in the fourth area, [the ALJ] will generally conclude that [the claimant's] impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in her ability to do basic work activities." *Hess*, 931 F.3d at 202 (quoting 20 C.F.R. 416.920a(d)(1) (citation omitted)).

"At step three, if the ALJ has found that a mental impairment is severe, he "then determine[s] if it meets or is equivalent in severity to a listed mental disorder." *Hess*, 931 F.3d at 202 (quoting 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2) and citing 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii) (explaining that, at step three, the ALJ determines whether

the claimant has "an impairment(s) that meets or equals" a listed impairment). "That analysis is done 'by comparing the medical findings about [the claimant's] impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder.'" *Hess*, 931 F.3d at 203 (quoting 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2)). As explained by the Third Circuit, "the claimant may have the equivalent of a listed impairment if, *inter alia*, he has at least two of '1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration[.]'" *Hess*, 931 F.3d at 203 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1).

"[T]o complete steps four and five of the disability analysis, if the ALJ has found that the claimant does not have a listed impairment or its equivalent, the ALJ 'will then assess [the claimant's mental RFC].'" *Hess*, 931 F.3d at 203 (quoting 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3) and citing 20 C.F.R. §§ 404.1520(a)(4)(iv)-(v), 416.920(a)(4)(iv)-(v) (providing that, at steps four and five, the ALJ considers the claimant's RFC)).

## B.    Issues Raised on Appeal

Plaintiff raises three issues on appeal:[4]    (1) her work history was improperly evaluated in her 2010 application and her current SSI application; (2) she is disabled due to tardive dyskinesia that causes functional blindness, schizoaffective disorder, bipolar disorder, clinical depression, anxiety disorder, disintegrating spine disorder, sciatica, and frequent swelling of the ankles; (3) the ALJ did not consider the fact that the State of Delaware determined Plaintiff has a mental illness

---

[4]    Plaintiff filed her Complaint *pro se*. Therefore, the Court must liberally construe her pleadings, and "apply the applicable law, irrespective of whether [s]he has mentioned it by name." *Holley v. Department of Veteran Affairs*, 165 F.3d 244, 247-48 (3d Cir. 1999); *see also Leventry v. Astrue*, Civ.A. No. 08-85J, 2009 WL 3045675 (W.D. Pa. Sept. 22, 2009) (applying same in the context of a social security appeal).

that qualifies her for housing; and (4) the 2010 decision finding her not disabled should be reopened, reversed, and she should be found disabled. Defendant raises two issues on appeal: (1) substantial evidence supports the ALJ's finding that Plaintiff is not disabled; and (2) Plaintiff has not shown that reopening or revising her prior claim is warranted.

### C.     The 2010 Application and the March 16, 2011 Decision

With regard to the Plaintiff's prior application for DIB and SSI benefits, the regulations provide that a determination or a decision made in a case which is otherwise final and binding may be reopened and revised under certain circumstances, including the following: (1) within twelve months of the date of the notice of the initial determination, for any reason: (2) within two years of the date of the notice of the initial determination if the agency finds good cause to reopen the case; or (3) at any time if the determination or decision was obtained by fraud or similar fault. *Id*. The agency will find good cause to reopen a determination or decision if (1) new and material evidence is furnished; (2) a clerical error was made; or (3) the evidence that was considered in making the determination or decision clearly shows on its face that an error was made. 20 C.F.R. § 416.1487. *Id.*

The record does not support any circumstances that allow reopening the 2010 decision. Plaintiff cannot satisfy the first two conditions for reopening a decision because the notice of the initial determination in her 2010 claim is dated March 16, 2011, and Plaintiff's request to reopen falls far outside both twelve month and two-year time periods for reopening either for any reason or for good cause. Nor has the third condition for reopening been met, given that Plaintiff has not alleged and the record does not support a finding that the 2010 decision was obtained by fraud or similar fault.

### D. The ALJ's August 30, 2017 Finding of Plaintiff's Physical and Mental Limitations

Plaintiff argues that her work history was improperly evaluated, she is disabled due to tardive dyskinesia that causes functional blindness, schizoaffective disorder, bipolar disorder, clinical depression, anxiety disorder, disintegrating spine disorder, sciatica, and frequent swelling of the ankles, and the ALJ should have considered that the State of Delaware determined Plaintiff's mental illness qualifies her for subsidized housing. The Commissioner argues that the ALJ properly followed the five-step sequential analysis process outlined in the Social Security Regulations, the ALJ considered all the evidence, sought testimony from a VE, and relied upon that testimony in finding that Plaintiff is capable of performing a significant number of jobs in the national economy which constitutes substantial evidence of non-disability. He also argues that substantial evidence supports the ALJ's decision that Plaintiff is not disabled.

The final responsibility for determining a claimant's residual functional capacity is reserved to the Commissioner. *See Breen v. Commissioner of Soc. Sec.*, 504 F. App'x 96 (3d Cir. 2012) (citing 20 C.F.R § 404.1546(c)). Here, the ALJ considered the effects of Plaintiff's conditions in relation to her ability to perform work. It is clear in reading the ALJ's decision that he thoroughly reviewed and considered the medical records submitted.

### 1. Physical Limitations

The ALJ found that Plaintiff had the severe impairments of degenerative changes of the lumbar spine and obesity, and he considered Plaintiff's non-severe conditions of asthma and ankle difficulties. With regard to Plaintiff's physical complaints, the ALJ found that Plaintiff's allegations were plausible in kind, but not in degree. He considered Plaintiff's complaints of disabling low back pain while noting the general absence of evidence to support Plaintiff's claim that she was functionally limited to the degree she alleged.

In doing so, the ALJ considered: (1) Dr. Lifrak's 2014 findings that Plaintiff appeared in no acute physical distress and walked without an assistive device, although she exhibited a "mild degree of limp" and did not appear to have any material vision difficulties, demonstrated full grip strength and muscle tone in her upper and lower extremities, had some evidence of limited range of motion in her hips and lumbar spine, but substantially intact range of motion of her joints; (2) objective medical evidence in the form of an April 2016 CT scan that showed very mild degenerative changes resulting in very mild bilateral neural foraminal narrowing at L5-S1 compared to Plaintiff rating her pain at seven on a ten-point scale; (3) the July 2016 examination that Plaintiff had full strength in the upper and lower extremities, no tenderness in the lumbar spine, and Plaintiff did not appear to be in acute distress or in pain when her physician was not speaking about pain; (4) 2016 examinations wherein Plaintiff appeared in no acute distress, exhibited normal muscle strength, a normal gait, only mild tenderness in the lumbar spine, and negative straight leg raising; and (5) February 2017 treatment records that indicated Plaintiff had intact sensation, no apparent coordination difficulties, and a normal gait. (*See* D.I. 8-2 at 19-20).

In addition, the medical opinions of record support the ALJ's residual functional capacity assessment. Dr. Taheri, who treated Plaintiff, suggested that she be limited to work at the light exertional level. Also, state agency physicians reviewing Plaintiff's opined that she had the physical residual functional capacity to perform light work consistent with the ALJ's residual functional capacity assessment. In light of the objective medical findings, substantial evidence supports the ALJ's residual functional capacity determination for a range of light work with postural limitations.

### 2. Mental Condition

With regard to mental impairment, the ALJ considered the impairment singly, and in combination, and determined at step three that Plaintiff's impairments failed to meet or medically equal any of the Listings. (*See* D.I. 8-2 at 17-18); *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (The Listings define impairments that would prevent an adult from performing any gainful activity, not just substantial gainful activity).

The ALJ considered Plaintiff's mental impairments under Listings 12.04, depressive, bipolar, and related disorders; and 12.06, anxiety and obsessive-compulsive disorders. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06. Under both listings, a claimant must satisfy the criteria outlined in paragraphs A and B or paragraphs A and C. *See id.* Paragraph A criteria relate to medical findings; Paragraph B criteria relate to impairment-related functional limitations; Paragraph C criteria relate to additional functional limitations.

As the ALJ explained in his analysis, in order to satisfy the paragraph B criteria of Listing 12.04 and 12.06, Plaintiff's impairments had to result in at least two of four of the following limitations: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (D.I. 8-2 at 17). The ALJ clearly and thoroughly addressed each of the above elements, adequately discussed Plaintiff's various symptoms and her treatment, and ultimately found that the above-stated requirements were not met or medically equaled, finding his limitations were either mild or moderate. (*Id.* at 17-18).

Because Plaintiff's mental impairments did not cause at least two marked limitations, or one marked limitation and repeated episodes of decompensation of extended duration, the Court finds that the ALJ appropriately found that the paragraph B criteria of Listing were not satisfied.

The ALJ then considered whether paragraph C criteria were satisfied and found the evidence failed to establish the presence of paragraph C criteria. (*Id*. at 18). The ALJ carefully considered the evidence, considered the Listings, and gave careful reasoning for his finding at step three of the sequential evaluation process.

The ALJ explained that Plaintiff's objective treatment history did not show that Plaintiff's mental impairments were as functionally limiting as she alleged. The ALJ referred to the examination by Dr. Kurz that indicated Plaintiff had had intact language skills, was able to follow directions, had no evidence of thought-processing disorders, presented as courteous and cooperative, showed no overt indications of depression or anxiety, had some attention difficulties, but could follow simple commands and was described as having "demonstrated generally intact cognitive skills." The ALJ considered Dr. Kurz's assessment that indicated the presence of material, but not especially limiting, mental symptoms appeared to be generally in accordance with Plaintiff's treatment and employment history. The ALJ considered Plaintiff's inpatient treatment for depression in 2011, while noting that she had not taken her psychiatric medication for months. Also, he considered that her mental status examinations generally revealed that she had "fairly good" memory, estimated average intelligence, "reasonably" intact concentration and attention; and her symptoms improved with treatment, including assistance with her living situation, and medication.

The ALJ referred to Plaintiff's treatment records from 2009 through 2013 that generally described her as alert and oriented, with no suicidal or homicidal ideation, only intermittent anxiety and depressive symptoms, and symptoms that benefited from treatment, including medication. The ALJ noted that Plaintiff's treatment records in 2015 and 2016 showed similar findings, with Plaintiff indicating that she felt "very well" on medication and that her medication was "really

working," and her physician describing her symptoms of anxiety and depression as "controlled." He also noted that Plaintiff's mental symptoms were "stable" in 2016, she had pursued new employment in 2017, and her mood was generally stable.

Notably, while the ALJ found that Plaintiff had the capacity to perform light work, he considered Plaintiff's mental condition and included the limitation that in performing light work, Plaintiff can have only brief and superficial contact with the public and co-workers.

### 3.      Medical Opinions

With regard to medical opinions, an ALJ is free to choose one medical opinion over another where the ALJ considers all of the evidence and gives some reason for discounting the evidence he rejects.   *See Diaz v. Commissioner of Soc. Sec*., 577 F.3d 500, 505-06 (3d Cir. 2009); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) ("An ALJ . . . may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."). In reading the ALJ's decision, it is clear he considered all the evidence.   Moreover, he provided reasons for the varying degrees of weight assigned to the numerous medical opinions.

With regard to Plaintiff's physical functional abilities, the ALJ gave only modest weight to Dr. Lifrak's opinion that Plaintiff could perform at slightly below the light exertional level, because his was not a lengthy treatment relationship, many of his diagnoses were equivocal, and his examination predated Plaintiff's ability to engage in substantial labor at her job at Amazon in 2015 and 2016, which involved lifting up to fifty pounds.   He gave moderate weight to Dr. Taheri's July 2016 opinion that he did not believe Plaintiff qualified for long-term disability, but she would be capable of light work, explaining that Dr. Taheri had a lengthy treating relationship with Plaintiff and his opinion was consistent with the record as a whole.   The ALJ

also gave moderate weight to the opinions of Drs. Kataria and Campo that Plaintiff was capable of a range of light work because they, too, were consistent with the evidence as a whole.

As to Plaintiff's mental residual functional capacity, the ALJ gave modest weight to Dr. Kurz' opinion that Plaintiff would have moderately severe limitations in work-related mental functioning, because his opinion predated abundant probative evidence, including medical records indicating that Plaintiff benefitted from treatment and engaged in apparent substantial gainful activity. The ALJ gave significant weight to Drs. King and Miripol's opinions that Plaintiff's cognitive and social limitations would not preclude her performance of work with simple, repetitive tasks because they were generally consistent with the overall weight of the evidence.

### 4.    Evaluation of Work History

Plaintiff contends the ALJ erred in the evaluation process in considering substantial gainful activity. Plaintiff refers to the ALJs' findings at step one of the sequential evaluation process that she had not engaged in substantial gainful activity since November 23, 2008 – the alleged onset date of disability – in her 2010 claim for DIB and SSI; and since July 7, 2014 – the date of the current application claim for SSI. Plaintiff argues that the ALJ erred in finding that she "was not engaging in 'gainful activity.'"   (D.I. 12 at 1).

It is not clear why Plaintiff takes exception to this finding. Had the ALJ found at Step One that Plaintiff had engaged in substantial gainful activity; the five step analysis would have ended with a finding of "not disabled." *See* 20 C.F.R. § 416.920(a)(4)(i) (if a claimant is performing substantial gainful activity, the agency will find that she is not disabled). The ALJ explained that while there was evidence that Plaintiff had either skirted or exceeded the substantial gainful activity threshold requirement, he gave her some benefit of the doubt and acknowledged that a sheltered work environment or other explanations to why her earnings did not accurately

reflect Plaintiff's productive capacity remained a possibility. (D.I. 8-2 at 15). He also recognized that from a practical standpoint, the earnings were not considered evidence of substantial gainful activity for purposes of his decision, as he found Plaintiff not disabled as Step Five of the five-step analysis. (*See id.*).

The Court does not agree with Plaintiff's assignment of error on this issue.

### 5. Subsidized Housing

Plaintiff seems to argue that the ALJ erred in his finding that she is not disabled because he did not consider that she qualifies for subsidized housing based upon her mental impairments. Plaintiff argues that the State of Delaware has determined she has a serious "mental illness that needs care, because [she] is unable to care for this alone." (D.I. 12 at 2). Plaintiff states that she lived in a N.A.M.I. House from 2010 to 2015, and she now lives in S.R.A.P. Housing. According to Plaintiff, only persons deemed to have a serious mental illness by the State of Delaware are qualified to live in S.R.A.P. Housing. (*Id.*). Defendant responds that a decision by the State of Delaware that Plaintiff was entitled to certain housing based upon her mental impairments is not binding upon the agency. (D.I. 15 at 21).

The Third Circuit Court of Appeals has instructed that "a determination by another governmental agency is entitled to substantial weight." *Kane v. Heckler*, 776 F.2d 1130, 1135 (3d Cir. 1985). A decision, however, by another governmental agency that an individual is disabled is not binding upon the ALJ. *See* 20 C.F.R. § 416.904; *see also Pratts v. Commissioner of Soc. Sec.*, Civ. No. 13-2372, 2015 WL 5139148 at *14 (D.N.J. Sept. 1, 2015); *Alston v. Astrue*, Civ. No. 10-839, 2011 WL 4737605 at *5 (W.D. Pa. Oct. 5, 2011).

The ALJ took note of Plaintiff's housing, stating that she has "lived in a group home with roommates during her alleged period of disability" and noting treatment records referring to

Plaintiff's general concern with situational factors such as housing assistance. (D.I. 8-2 at 17, 21). During the administrative hearing, Plaintiff testified that she first resided in a home strictly for those with psychological problems and now lives in a facility that is more "independent." The ALJ, acknowledged Plaintiff's housing, but did not assign any weight to the decision to provide Plaintiff subsidized housing based upon her psychological problems. And, in this case he was not required to do so. Nothing in the record suggests that the State of Delaware made a finding of disability that entitled Plaintiff to subsidized housing. Instead, based upon Plaintiff's testimony, the State of Delaware determined she has psychological problems or mental illness, as opposed to a disability, that qualified her for subsidized housing.

Moreover, even had it been necessary for the ALJ to specifically address the State of Delaware's determination, remand is not necessary because, based upon the record, there is "no reasonable likelihood that [his] consideration" of the State of Delaware's decision to provide Plaintiff subsidized housing would have changed the ALJ's determination. *See e.g.*, *Marquez v. Berryhill*, Case No. 2:17-cv-00017, 2018 WL 1626264 (D. Vt. Apr. 4, 2018) (quoting *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010)).

### 6. Substantial Evidence

Substantial evidence supports the ALJ's finding that Plaintiff has both the physical and mental residual functional capacities to perform the limited range of work identified by the vocational expert. Plaintiff seems to argue that she is disabled based on tardive dyskinesia (resulting in blindness), schizoaffective disorder, bipolar disorder, clinical depression, anxiety disorder, disintegrating spine disorder, sciatica, and frequent swelling of the ankles. (D.I. 12 at 2). As discussed below in more detail in Paragraph III.E., Plaintiff was not diagnosed with tardive dyskinesia until after the ALJ issued his decision. With regard to schizophrenia, during the

June 23, 2017 hearing, Plaintiff's attorney seem to indicate that the diagnosis of schizophrenia was due to medications Plaintiff had been prescribed. (D.I. 8-2 at 34). Regardless, the ALJ considered any schizophrenia related symptoms within the context of Plaintiff's severe mental impairments, considered Dr. Kurz' diagnosis of schizophrenia, explained Dr. Kurz was the only physician who made the diagnosis and, noted that otherwise, there is little support for such a finding in Plaintiff's objective treatment record. The ALJ reasonably made that determination based upon the record.

At step two, the ALJ considered Plaintiff's impairments of anxiety, depression, and bipolar disorder, found them severe, and considered the limitations caused by the conditions in determining Plaintiff's residual functional capacity for a range of unskilled, light work with postural and non-exertional mental limitations. With regard to Plaintiff's spine disorder and swelling in her ankles, the ALJ found that Plaintiff's degenerative changes of the lumbar spine were a severe impairment considered functional limitations as a result of the spine disorder in the residual functional capacity determination for light work with postural limitations. The ALJ also took note of Plaintiff's ankle condition, considered the evidence regarding the condition, and reasonably determined that the evidence did not support a finding of a severe impairment because the ankle pain was limited in duration and recent treatment records indicated Plaintiff had a normal gait.

It is clear from reading the ALJ's decision that he considered the medical records as well as the medical opinion evidence and outlined his reasoning in affording weight to the opinions and in determining that Plaintiff has the RFC to perform light work with the added of limitations that she could only occasionally climb ramps or stairs, occasionally climb ladders, rope, or scaffolds, and occasionally stoop, kneel, crouch, or crawl, and is limited to only simple, routine, and

repetitive tasks, with only brief and superficial interaction with the public and coworkers. After the VE testified that Plaintiff was unable to perform any past relevant work, the ALJ appropriately relied upon the VE's testimony in concluding that Plaintiff could perform jobs that exist in significant numbers in the national economy. Accordingly, the Court finds that substantial evidence supports the ALJ's ruling, his evaluation of Plaintiff's residual functional capacity, and his determination that Plaintiff was not disabled.

### E.    Sentence Six Remand

It may be that Plaintiff seeks a Sentence Six remand pursuant to 42 U.S.C. § 405(g) given than she submitted records of medical visits in 2019 that show a diagnosis of tardive dyskinesia. (D.I. 16 at 4-10). Under Sentence Six, the Court may order a remand based upon evidence submitted after the ALJ's decision, but only if the evidence satisfies the following: (1) the evidence is "new" and not merely cumulative; (2) the evidence is material and there is a reasonable probability that the new evidence would have changed the outcome of the Commissioner's determination; (3) the evidence does not concern a later-acquired disability or subsequent deterioration of the previously non-disabling condition; and (4) there is "good cause" for not including the new evidence in the administrative record. *Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984).

The records Plaintiff submitted are for dates after the ALJ issued his August 30, 2017 decision and after the Appeals Council issued its August 31, 2018 decision finding that Plaintiff had not provided a basis for changing the ALJ's decision. In addition, the records concern a later acquired condition, tardive dyskinesia. "Evidence is material if the [AL's] decision might reasonably have been different had the [new] evidence been before him when his decision was

rendered." *Wilson v. Astrue*, 602 F.3d 1136, 1148 (10th Cir. 2010) (internal quotation marks omitted).

The Court has reviewed these medical records and conclude they would not reasonably have changed the AL's decision. None "purport[s] to retroactively diagnose a condition existing in the period preceding the ALJ's decision [or] indicate[s] any impaired functioning relating back to that period," *Krauser v. Astrue*, 638 F.3d 1324, 1329 (10th Cir. 2011). Indeed, the records indicate that when Plaintiff presented on January 22, 2019, she described "severe twitching of both eyes since November 2018," a date after both the ALJ and Appeals Council decisions. (D.I. 16 at 5). Because the records are dated after the ALJ's decision, this new condition, tardive dyskinesia, is relevant only to a new application for benefits commencing after the ALJ's decision. *See Szubak*, 745 F.2d at 833; *Krauser v. Astrue*, 638 F.3d at 1329.

The 2019 medical records do not warrant a remand for further consideration and, therefore, the Court finds no basis to remand pursuant to the sixth sentence of 42 U.S.C. § 405(g).[5]

IV.   **CONCLUSION**

For the reasons discussed above, the Court will:   (1) deny Plaintiff's motion for summary judgment (D.I. 12); and (2) grant the Commissioner's cross-motion for summary judgment (D.I. 14).

A separate order will be entered.

---

[5]   Plaintiff has available the option of filing a new application should she believe the new evidence supports an award for disability insurance benefits.   *See* 20 C.F.R. § 416.330(b).